## JOHN BRYANT *et al. versus* CHARLES RUSSELL *et al.*

*On the 26th and 27th of December, 1833, the owner of certain property, real and personal, assigned the same to four individuals, who, in consideration thereof, gave him their joint negotiable notes for a large amount, but less than the value of the property as estimated in a list exhibited at the time. The notes contained a proviso, that if it should thereafter appear that any incumbrance was then existing upon any portion of the property assigned, the amount of the incumbrance should be indorsed upon the notes. The assignees also gave the assignor a bond, conditioned that they would sell the property, and that if the proceeds should be more than the amount of the notes, they would pay over to him the excess. The assignor, being indebted to certain banks and to divers individuals, upon notes and drafts, indorsed to the banks the notes of the assignees, on the 28th of December, and on the same day made an agreement, under seal, with the banks, wherein the banks covenant that they will pay his notes and drafts enumerated in a schedule annexed to the agreement, (being equal in amount to the notes of the assignees, and many of them being held by the banks themselves,) at the time they shall become due and payable respectively, provided no indorsement shall be made on the assignees' notes on account of any incumbrance on the property assigned, and that if such an indorsement shall be made, they will pay the notes and drafts in the schedule, excepting such an amount of them as shall equal the amount of the indorsement ; and in case either of the banks held any notes or drafts upon which the assignor was promisor or acceptor, which were unintentionally omitted in the schedule, such bank was in the first instance to receive the amount due upon such notes or drafts, and the amount thereof was to be deducted from the sum to be paid by the banks upon the notes and drafts in the schedule. On the 4th of January, 1834, an agreement under seal was made between the banks and the assignees, with the knowledge and consent of the assignor, whereby the assignees covenant to pay to the banks the proceeds of the property from time to time as the same shall be received, to be applied in payment of the assignees' notes, and in consideration thereof, the banks covenant that they will not demand of the assignees, on account of these notes, a greater amount than shall have been at such time actually received by them from the sales. The banks proceeded to pay the scheduled notes and drafts from time to time as they fell due, until they had notice that by reason of notes held by them and unintentionally omitted in the schedule, and of incumbrances on the property assigned, there would be a deficiency of assets to pay the whole of the scheduled notes and drafts. It was held ; —*

That the agreement between the assignor and the banks created a trust in favor of the scheduled creditors, to have their demands paid by the banks ; —

That this Court had jurisdiction in equity to enforce s ·ch trust, by virtue of *St.* 1817, *c.* 87 ; —

That any one of such creditors could not by himself maintain a bill in equity against the banks to compel payment of his demand, but he should join all the other scheduled creditors whose demands had not been satisfied, or should sue in behalf of himself and such others of those creditors as should choose to come in and obtain satisfaction of their demands equally with him ; —

That the clause in the agreement between the assignor and the banks, respecting notes or drafts, held by the banks, and unintentionally omitted in the schedule, upon which the assignor was "*promisor or acceptor*," was intended to embrace securities on which the assignor stood as principal debtor, and was therefore applicable

to a draft *drawn* by him on a drawee without funds in his hands to meet it, and not accepted; it appearing that other drafts of the same character were included in the schedule: —

That the proviso, that if it should thereafter appear that there were incumbrances then existing on the property assigned, the amount of them should be indorsed on the assignees' notes, was intended to apply to incumbrances not openly appearing, and which might reasonably be understood to be not then known, recollected, and taken into consideration; notwithstanding that by some legal principle the assignees might be deemed to have had constructive notice: —

That in computing the amount of an incumbrance arising from an attachment, the assignees had a right to include interest and costs accruing upon the debt: —

That a failure of the assignor's title to any parcel of the property, was to be deemed an incumbrance, and that the amount of such incumbrance was to be computed according to the amount at which the parcel was valued in the list of property exhibited at the time of the assignment: —

That a part of the consideration for the assignees' notes being the assignor's own note, with a mortgage, as collateral security therefor, of " all his right, title and interest " in a manufactory, consisting of real and personal estate, and it afterwards appearing that he had joined with the other proprietors of the manufactory in conveying it to trustees to sell it, and out of the proceeds to pay the debts of the company and account for the surplus, if any, and that there was no surplus, there was an entire failure of the assignor's title, and the assignees had a right to have the whole amount of his note deducted from and indorsed upon their notes; but if there had been no such previous conveyance of the legal estate, it seems they would not have been entitled to any deduction on account of the manufactory's proving to be of no value by reason of the company's debts: —

That the fund in the hands of the banks being insufficient to pay all the scheduled notes and drafts which were proved in a creditor's bill in equity against the banks, the creditors who neglected to come in and prove their debts were not to be taken into consideration in the distribution of the fund, nor their proportions to be retained by the banks, but the whole fund was to be distributed among those creditors who had proved their debts: —

That the liability of the assignees on their notes, was not limited to their receipts from the sales of the property assigned, but that they were bound to pay the full amount of their notes, making the stipulated deductions for incumbrances: —

That the scheduled creditors were entitled to interest on their respective notes and drafts, to be computed from the times when the same became due and began to draw interest: —

That although it was expressly provided that the scheduled debts should be paid in full as they became due, yet it was upon the supposition that the fund would be sufficient to pay them all, and without any intent to give one a preference over another, and as there was a deficiency of assets, the loss ought to be apportioned upon all the debts *pro ratâ:* —

That the banks were however to be protected in their payments in full to third persons, made in good faith and before they had reason to suppose there would be a deficiency of assets; but that all the scheduled notes and drafts of which the banks were themselves the holders, must bear their proportion of the loss: —

That the banks were not required to abstain from paying the debts in full as they became due, upon a mere technical and constructive notice that the fund would be insufficient to pay them all, but it must be shown to have been apparent to them that there would be a deficiency: —

Bryant
v.
Russell

And that the scheduled creditors, plaintiffs in the bill in equity against the banks, ought to be allowed their costs, to be paid out of the trust fund, but that the defendants' costs ought not to be allowed.

BILL in equity. The suit was commenced by Bryant and three others, copartners under the firm of Bryant, Sturgis & Co., against Charles Russell, (surviving partner of John S. Russell, formerly merchants doing business at New Bedford, in the county of Bristol, under the firm of Charles Russell & Son,) Joseph Ricketson, John A. Parker, Joseph Grinnell and William Rodman, all of New Bedford, and the Bedford Commercial, the Marine, the Merchants', and the Mechanics' banks, in New Bedford.

The bill alleges, that Charles Russell & Son, on the 9th of September, 1833, drew two bills of exchange on Robinson, Tyson & Co., each for $3000, payable, the one in six and the other in seven months after the date, to Benjamin Mumford ; that the drawees accepted the bills on the 9th of November, 1833, and on the same day Mumford indorsed them to the plaintiffs ; that payment was demanded of the drawees when the bills respectively became due, and was refused, and notice thereof was given to Charles Russell, his partner John S. Russell having deceased before that time ; and that the bills remain unpaid.

The bill further alleges, that the Russells, on or about the 26th of December, 1833, granted and conveyed to Ricketson, Parker, Grinnell and Rodman, jointly and severally, divers parcels of land, ships and merchandise, of the value of $128,000 and upwards ; in consideration whereof the grantees gave to the Russells their joint promissory notes, dated the 28th of December, payable in six months from the date, one for $38,851·86, payable at the Bedford Commercial bank, another for $38,851·86, payable at the Merchants' bank, another for $29,138·90, payable at the Marine bank, and another for $19,425·94, payable at the Mechanics' bank, (amounting in all to $126,268·56 ;) it being provided however, in each of these notes, that if it should thereafter appear that any incumbrance was then existing upon any portion of the real or personal property, conveyed to the promisors, a certain specified proportion of the amount of such incumbrance should be indorsed upon each of the notes

It further alleges, that the Russells were indebted to Robinson, Tyson & Co. in the sum of $10,000, and to divers other persons upon divers notes, drafts and acceptances, all which they were desirous to provide for and discharge, and for this purpose they, on or about the 28th of December, 1833, indorsed the four notes above specified and deposited them respectively in the banks at which they were payable, and em powered the banks respectively to collect and receive the amount of those notes ; and that the banks entered into certain covenants with the Russells, by an instrument under seal, dated the 28th of December, 1833, and which the plaintiffs pray may be produced and exhibited.

This agreement made by the Russells, of the first part, and the banks, by their attorney, Charles H. Warren, of the second part, recites the making of the four promissory notes by Ricketson and others, and that the Russells are indebted to Robinson, Tyson & Co. in the sum of $10,000, and to other persons upon notes, drafts, and acceptances, a schedule of which is annexed to the instrument, and that the several banks have agreed to receive of the Russells the four notes given to them by Ricketson and others, and thereupon to pay, take up and discharge the several notes, drafts and acceptances in the schedule contained, in the manner and proportions afterward mentioned, and to pay Robinson, Tyson & Co. the sum of $10,000, due to them as before mentioned, and that the Russells agree that the four notes shall be indorsed respectively to the four banks. And this instrument contains the following provisions : " And the said parties of the second part do on their part agree to and with the said Charles Russell and John S. Russell and their assigns, that they will pay to the said Robinson, Tyson & Company, the said sum of $10,000, so due to them as aforesaid, and that they will pay, take up and discharge all the said notes, drafts and acceptances in the said schedule mentioned, at the time they shall become due and payable respectively, provided no indorsement shall be made on the said notes of the said Ricketson, Parker, Grinnell and Rodman, by reason or on account of any existing incumbrance upon the property before referred to ; and if such indorsement should be made, the said parties of the second part agree that

they will pay, take up and discharge the said several notes, drafts and acceptances, in said schedule mentioned, excepting such an amount of them as shall equal the amount of such indorsement. And whereas it is possible that the said banks, or some of them, may now hold drafts or notes upon which the said Charles Russell and John S. Russell, or one of them, are promisors or acceptors, which have been unintentionally omitted in the said schedule, it is agreed and declared to be the true meaning and intent of these presents, that the said bank or banks holding such notes or drafts are, in the first instance, to receive the amount due upon the said notes or drafts ; and that the amount of the said notes or drafts is to be deducted from the sum to be paid upon the notes, drafts and acceptances in said schedule mentioned by the said parties of the second part." Then follows a clause by which it is provided, that all advances and payments to be made by the banks shall be in the proportion of the amounts of the four notes of Ricketson and others held by them respectively. The notes and drafts contained in the schedule, together with the sum of $10,000, to be paid to Robinson, Tyson & Co., amount to $126,268·56, being equal to the amount of the four notes of Ricketson and others.

The bill then alleges, that by means of the doings of the defendants or some of them, a trust has been created in favor of the plaintiffs, to have and receive from the banks the amount of the two bills of exchange before described, held by the plaintiffs, which two bills were intended to be and are contained in the schedule annexed to the agreement above mentioned, though by accident and mistake the same are not accurately described as to the dates and term of credit thereof ; and that payment thereof has been demanded of the banks, but by them refused.

The bill prays that the defendants may answer, &c ; and that the banks may be compelled to pay the plaintiffs the amount of these two bills of exchange, or such part thereof as shall be found due, in proportion with all the other creditors of Charles Russell & Son, whose demands were provided for by the trust instrument between the Russells and the banks ; and that the plaintiffs may have such other relief, &c.

Charles Russell, in his answer, says that he and his son con

veyed to Ricketson and others, on the 26th and 27th of December, 1833, real and personal property, as stated in the bill, which was estimated by the parties to be of the value of $ 177,650 ; that in consideration thereof, Ricketson and others made their four promissory notes, as above described, and a bond, dated the 28th of December, 1833, with condition that they will sell and dispose of the property conveyed, and if, from the sales, they shall realize more than $ 126,276·35, with interest, after deducting all expenses, they will pay to the banks whatever sums may then be due to the banks or either of them, by the Russells or either of them, as sureties or indorsers for any person or persons, if the excess shall be sufficient for that purpose, or if it shall not be sufficient, that they will pay to the banks the excess in proportion to the said several demands, and that they will pay over to the Russells or their assigns, all such money as may remain after the payments to the banks, and will retransfer and reconvey to the Russells any portion of the property which may remain unsold. The respondent further says, that the Russells were indebted upon divers notes and drafts, and that on or about the 28th of December, 1833, they indorsed the four notes of Ricketson and others to the banks, and entered into the agreement with the banks, as set forth in the bill, for the purpose of paying their said notes and drafts as the same should become due and payable. He further says, that Russell & Son drew the two bills of exchange held by the plaintiffs, and that notice was given to the respondent of the drawees' refusal to pay the same ; and that these bills were intended to be, and are, contained in the schedule annexed to the agreement made by the banks with the Russells, though by accident and mistake the same are not accurately described therein as to the dates and terms of credit.

The other defendants filed a joint and several answer, in which they state that they do not know whether the two bills of exchange were drawn &c. as set forth in the bill. They admit that the Russells, by deeds and bills of sale dated the 26th and 27th of December, 1833, conveyed to Ricketson and others certain real and personal estate ; but the individual respondents deny , and the banks believe the denial to be true, that

the property was of the value of $128,000. They admit the making of the four notes by Ricketson and others, and that they were indorsed and deposited in the banks. They admit that an instrument in writing under seal, as above set forth, was made between the Russells and the banks. They deny that the two bills of exchange held by the plaintiffs were contained in the schedule annexed to that instrument; and they say they do not know whether they were intended to be contained in it. They allege that the property conveyed to Ricketson and others was subject to divers incumbrances; that the lot and house in Water street, New Bedford, was subject to a mortgage (to Abraham Kirby) for $3000; that all the real estate was subject to the taxes laid thereon for the year 1833; that a part or all of the real estate was under attachments made by certain creditors of Charles Russell; that the Russells were not the owners of five eighths of the ship South Carolina, as stated in the assignment, but of four eighths only; nor of twenty-nine thirty-second parts of the ship Martha, but of twenty-five only; that the intended mortgage of the Washington Iron works, at Wareham, in the county of Plymouth, supposed to be of the value of $20,000, has, by reason of the lien thereupon claimed by the copartners of Charles Russell, who with him were joint owners thereof, for the payment of the debts of that co partnership and other causes, been ascertained to be of no value; that the mortgage made by Weeden to Charles Russell, purporting and supposed to be of the value of $2700, has been ascertained to be of the value of $1200 only; by means of all which there was a corresponding failure of the consideration for which the four notes of Ricketson and others were given; and the respondents allege that these liens, attachments, mortgages, deficiencies in title and in value, should be considered as "incumbrances," within the meaning of the proviso on the four notes, and that Ricketson and others have, by their notes in writing of the 6th of April, 1834, and 12th of January, 1835, required the banks to indorse on those notes the sums of $23,000, and $16,998.32, on account of such incumbrances; which sums, amounting to $39,998.32, together with such further sums as it shall appear proper to indorse, the banks say they ought not to pay.

The banks say, that in a schedule, marked B, they have set forth the demands they have paid, amounting to $ 54,615·33. The respondents further say, that at the time of the conveyances to Ricketson and others, and of the execution of their bond to the Russells, it was the intent of the parties, that the grantees should be held to pay no further or greater sums of money than should be eventually realized from the proceeds of the property ; and that in pursuance of that intent, and after those notes had been indorsed to the banks, to wit, on the 4th of January, 1834, an agreement under seal was made, between the banks of the one part, and Ricketson, Parker, Grinnell and Rodman, of the other part, with the knowledge and consent of the Russells, whereby Ricketson and others covenanted to pay over to the banks, as fast as received, the proceeds of sales of the property conveyed, to be applied to the payment of the four notes, and the banks covenanted that they would not at any time demand of Ricketson and others, on account of the four notes, a greater amount than should have been at such time actually received by them from the sales, deducting the necessary expenses of managing the property.   The respondents say that these contracts were made for the benefit of the Russells, and with no intent to enter into any contract with creditors, or for their benefit, except so far as it was for the benefit of the creditors, to enable the Russells to pay their debts, as the same should become due ; that they had no expectation of profit or benefit to themselves, except that they thus secured the payment of debts due from the Russells to the banks ; and that at the time when the negotiations between the Russells and Ricketson and others were pending, preparatory to entering into the arrangement between them, the Russells exhibited a schedule of the parcels of property ntended to be conveyed, and of their respective values, amounting to $ 177,650, and that the same schedule was delivered to the banks at the time of their entering into the agreement with the Russells, and the respondents were informed and believed that the property conveyed was of much greater value than the amount of the four notes, otherwise they would not have entered into the arrangement; that the grantees have met with great embarrassments in selling the

property, by reason of defects of title, &c. so that the proceeds have not been received as was anticipated at the time of the conveyance ; but nevertheless the banks have advanced the sums necessary for the payment of several notes, bills of exchange and debts specified, being a large portion of those mentioned in the schedule annexed to their agreement, to be paid as they should become due, and by reason thereof a large sum is due to the banks for interest ; which, with the amount of the notes, bills and acceptances discounted and held by the banks, and of those paid by the banks, make the sum of $ 96,504·45 ; that the respondents believe that the net proceeds of all the property will not be sufficient to reimburse the banks the money already paid by them.

The respondents deny that any contract, agreement or trust has arisen or been created, by reason whereof the plaintiffs have any right to demand or receive from the banks the sums of money alleged to be due to the plaintiffs, or that the respondents, or either of them, are under any accountability to the plaintiffs.

In a supplemental answer the defendants exhibited an account, by which it appeared that the property sold amounted to $ 87,120·02, and the property unsold, to $ 19,259, making together $ 106,379·02 ; and that the payments made by, and the sums due to the banks, amounted to $ 102,002·25.

On a hearing upon the bill and answer, *C. P. Curtis* contended, that the Court had equity jurisdiction in this case, under *St.* 1817, *c.* 87, on the ground that the sealed instrument executed by the banks created a trust in favor of the creditors named in the schedule annexed to that instrument. Had it been a parol contract, the plaintiffs could have maintained an action at law against the banks ; *Hall* v. *Marston*, 17 Mass. R. 575 ; but being under seal, a bill in equity is their proper remedy. 1. Chit. Pl. 2, 3, 4 ; *Gregory* v. *Williams*, 3 Meriv. 582 ; *Ward* v. *Lewis*, 4 Pick. 523 ; *New England Bank* v. *Lewis*, 8 Pick. 113 ; *Cumberland* v. *Codrington*, 3 Johrs. Ch. R. 261 ; *Shepherd* v. *M'Evers*, 4 Johns. Ch. R. 137.

*C. G. Loring* and *F. C. Loring, contrà.* No trust on the part of the banks is created by their agreement. They did

not intend to create one. They have no trust fund. They covenant to pay the debts of the Russells as they shall become due, not out of the proceeds of the four notes of Ricketson and others, but absolutely, whether those notes shall or shall not be paid ; with a limitation in case of incumbrances on the property conveyed to Ricketson and others. This legal liability negatives the existence of a trust or confidence. The four notes do not constitute a trust fund, because they might never be paid. The incidents of a trust cannot be exercised by the Court in this case. It could not remove the supposed trustees for misbehaviour, nor appoint a receiver, at the request of the plaintiffs ; and an application for those purposes by the Russells, would be met by referring them to their remedy on the covenants. Should the banks ask to be released from the supposed trust, the plaintiffs would object that they had assumed a legal duty, from which they could be discharged only by paying the debts specified in the schedule annexed to their agreement. No case can be found, in which the promisor or obligor to pay a debt for another has been adjudged to be a trustee for the creditor. On the contrary, if there is any trust here, it is in the promisees ; but they are not charged in the bill as trustees. But if there is a trust, it is not such a trust as will give this Court equity jurisdiction under the statute, not being a trust arising under a deed, either in express terms or by legal construction, but only a trust implied from the relation of the parties. *Black* v. *Black*, 4 Pick. 234. The instrument cannot be supported as an assignment in trust, no creditors except the banks themselves being parties to it, and any surplus property coming into their hands, not required for the payment of their own debts, being attachable on the trustee process. As to trusts, see Jeremy on Eq. Jurisdiction, 82 ; *Page* v. *Broom*, 4 Russell, 6 ; *Wallwyn* v. *Coutts*, 3 Meriv. 707 ; 1 Tamlin, 470 ; *Sturt* v. *Mellish*, 2 Atk. 610 ; *Cook* v. *Fountain*, 3 Swanst. 591.

All the creditors named in the schedule, whose debts had not been paid, ought to have been joined as plaintiffs, as any decree must affect them all. The other creditors are interested to deny that the plaintiffs' bills of exchange are contained in the schedule, the funds being insufficient to pay all those

44

whose demands are correctly described. And if the debts are to be paid in the order of their falling due, the creditors whose demands become due later have an interest in excluding preceding claims. *Hamilton* v. *Houghton*, 2 Bligh's Parl. Cas. 169 ; *Buccle* v. *Atleo*, 2 Vern. 36 ; *Hamm* v. *Stevens*, 1 Vern. 110. And it is not too late now to take this objection. Hoffman's Ch. Pr. 497 ; *Darwent* v. *Walton*, 2 Atk. 510 ; Edwards on Parties, 2, 7, 40, 169 ; *Wakeman* v. *Grover*, 4 Paige, 33 ; *Egberts* v. *Wood*, 3 Paige, 520.

*C. P. Curtis*, in reply, said that if there were any other creditors whose demands were unpaid, and if it were necessary to join them as plaintiffs, the bill might be amended, and without costs. *Good* v. *Blewitt*, 13 Ves. 397 ; *Court* v. *Jeffery*, 1 Sim. & Stu. 105 ; *Small* v. *Atwood*, 2 Younge & Jerv. 515 ; *Hitchens* v. *Congreve*, 1 Simon, 500 ; *Jackson* v. *Lee*, 1 Dickens, 92 ; *East India Co.* v. *Neave*, 5 Ves. 185 ; *Andree* v. ———— 2 Dickens, 768.

WILDE J. delivered the opinion of the Court. The plaintiffs seek to enforce the execution of a trust by the four banking corporations, defendants in this case, claiming to recover of them the amount of two drafts or bills of exchange due to the plaintiffs from Charles Russell, the surviving partner of Charles Russell & Son, who is also one of the defendants. The facts alleged in the bill and admitted by the answer, so far as it is now necessary to consider them, are briefly these.

In December, 1833, Charles Russell & Son conveyed to Joseph Ricketson, John A. Parker, Joseph Grinnell and William R. Rodman, the other defendants, certain lands, ships and merchandise, of the estimated value of $ 128,000 and upwards. In consideration whereof the said Ricketson and others gave Charles Russell & Son their joint promissory notes of hand for the amount of $ 126,268·56. It was however provided, that if any incumbrance existed on any portion of the property conveyed, a certain specified proportion of the amount of such incumbrance should be indorsed on each of said notes.

Charles Russell & Son were then indebted to divers persons on drafts and acceptances, (and among others to the complainants,) and being desirous to pay the same, they for this pur-

pose indorsed the said promissory notes to the banks, authorizing and empowering them to collect the same; and the banks thereupon, by an instrument in writing under seal, covenanted and agreed with Charles Russell & Son, that they would pay the several demands mentioned in a schedule annexed to the instrument, including the demands now claimed by the plaintiffs. The banks, in their answer, deny that the two bills of exchange held by the plaintiffs were included in the schedule, but Charles Russell, in his answer, admits and affirms that these bills of exchange were included in the schedule, but by accident and mistake the same were not accurately described, as to the dates and terms of credit thereof.

The fact must be known by Russell, and for the present we proceed on the assumption that it is truly stated in his answer. We leave that question however open for further evidence There was a proviso in the said instrument, that should there be any indorsement made on either or all of the said notes by reason of any incumbrances on the property conveyed, then the banks were to pay said notes excepting the amount so indorsed. And it was also provided, that if either of the said banks should hold any paper omitted by mistake in the said schedule, such paper should be first paid and the amount thereof be deducted from the amount to be paid by the banks.

On these facts the plaintiffs contend, that a trust has been created in their favor, to have the amount due on their bills paid by the banks, of which this Court has jurisdiction under the statute of 1817, c. 87.

On the other hand, the counsel for the banks maintain, that no trust has been created in favor of the plaintiffs or the other creditors named in the schedule; that the notes were absolutely transferred by the Russells to the banks, and not in trust for their creditors; that the promise of the banks to pay the notes mentioned in the schedule was a promise made to the Russells, to which, and the consideration of which, their creditors are strangers, and can thereby derive no right either at law or in equity. It is admitted that the plaintiffs, not being a party to the contract under which they claim, have no remedy at law against the banks; but 'r is insisted that a trust may be created by a contract to which the *cestui que trust* is not a party.

Bryant
*v.*
Russell.

And undoubtedly a trust may be thus created. The cases of the *Duke of Cumberland* v. *Codrington*, 3 Johns. Ch. R. 261, — *Shepherd* v. *M'Evers*, 4 Johns. Ch. R. 136, — *Weston* v. *Barker*, 12 Johns. R. 276, — *Neilson* v. *Blight*, 1 Johns. Cas. 205, and *Ward et al.* v. *Lewis et al.*, 4 Pick. 518, fully maintain this position. The general doctrine laid down in these cases is, that a trust may be created for the benefit of third persons, without their knowledge at the time, and that they may afterwards affirm the trust and enforce its execution. After such affirmation by the *cestui que trusts*, the parties creating the trusts have not the power to annul or vary them without the assent of the *cestui que trusts*.

The case of *Wallwyn* v. *Coutts*, 3 Meriv. 707, is supposed by the defendants' counsel to maintain a contrary doctrine. In that case the Duke of Marlborough and Marquis of Blandford, by deed, had created a trust for the payment of their creditors, to which deed no creditor was a party, nor was there any consideration moving from any creditor. The duke and marquis afterwards executed other deeds varying the trusts of the first deed. The plaintiff Wallwyn, a creditor under the first deed, filed his bill against the duke and marquis and the trustees, to have his debts declared a lien on the estates, and for an injunction, to restrain the trustees from executing the subsequent trusts, till they had raised money sufficient to answer the first trusts. This injunction was refused, on the ground, that the trust being voluntary, the court would not enforce it against the duke and marquis, who might vary it as they pleased.

The decision in this case is not inconsistent with the doctrine now laid down, for it does not appear that any creditor under the first deed had assented to or had notice of the trusts created in his favor before the trusts were varied, and until such notice and assent, express or implied, the trusts might be revoked or altered by the parties creating them. 2 Story on Equity, 309. But a *cestui que trust*, after assenting to a trust, no intermediate revocation having been before made, whether a volunteer or not, or be the limitation under which he claims with or without a consideration, is entitled to the aid of a court of equity. *Haslewood* v. *Pope*, 3 P. Wms. 222; 1 Madd. Ch. Pr. 354.

The question then is, whether any trust has been created in favor of the plaintiffs and the other creditors mentioned in the schedule, by the instrument executed by the Russells and the banks. And of this we think there is no doubt. The sole object for assigning the four notes to the banks was to secure the creditors mentioned in the schedule. These notes constituted the trust fund, and it makes no difference that the banks engaged at all events to pay the creditors, for they were at liberty, if they saw fit so to do, to take the fund at an estimated value, and to take the risk of its ultimate failure or diminution. They would therefore be bound by their engagements and covenants, although the fund should have failed. A trustee may be personally responsible, although strictly speaking he has no trust fund, either by mismanagement or by assumed liabilities. In such cases he must draw on his own funds wherewith to discharge his trusts. Trusts which are exclusively cognizable in courts of equity, as Judge Story correctly defines them, embrace all those obligations which *ex æquo et bono* a party ought to perform, and where there is no legal remedy. 2 Story on Equity, 230. Implied trusts, as Chancellor *Kent* remarks, are liable to be extended indefinitely, in cases where there may be no other way to recognise and enforce the obligations which justice imperiously demands. 4 Kent's Comm. 312.

The action of money had and received is in the nature of a bill in equity founded on an implied trust.

This case, however, does not depend on any implied or constructive trust. By the transfer of the four notes to the banks, and by the instrument declaring the purposes, uses and trusts, for and upon which that transfer was made, an express trust was created by the parties, which brings the case clearly within the equitable jurisdiction of this Court. The same liberal and equitable principles which have been adopted by courts of equity in regard to implied and constructive trusts, are to be extended to the construction of express declarations of trust. These, like all other instruments, deeds and contracts, are to be construed according to the intention of the parties. It is not necessary that a trust should be declared in express terms *ipsis verbis ;* for it is sufficient if the intention to create it can be fairly collected from the terms used.

Now it appears to us quite clear, from the terms of the instrument in question, that the parties intended to create a trust in favor of the plaintiffs and the other creditors mentioned in the schedule. This is apparent from the following clause in the recital or introductory part of the agreement :

" Whereas the said several banks have agreed to receive of the said Charles Russell and John S Russell the said several notes so given to them as aforesaid, by the said Ricketson, Parker, Grinnell and Rodman, and thereupon to pay, take up and discharge the said several notes, drafts, and acceptances in the said schedule mentioned, in the manner and proportions hereinafter particularly mentioned," &c.

To this clause is superadded an express promise of the banks to pay the creditors in full, subject however to certain provisoes. This promise would be binding on the banks, although no trust had been created. And on a bill properly framed, with apt parties, the Court would decree a specific performance. It is true the Court will not decree a specific performance of a contract on the complaint of a person who is not a party, but the person beneficially interested may have relief by joining the promisee as a co-plaintiff, as was decided in the case of *Gregory and Parker* v. *Williams*, 3 Meriv. 582. In that case, Williams, the defendant, entered into an agreement with Parker to pay a debt due from him to Gregory. This was done without the knowledge of Gregory, and he furnished no part of the consideration for the agreement. And it was held that Parker acted as the trustee of Gregory, and that Gregory derived an equitable right through the mediation of Parker's agreement. So here the plaintiffs would have a right to insist upon the benefit of the promise made to the Russells, even if no trust had been created. But as we are of opinion that a trust has been created, which the plaintiffs are entitled to enforce, there can be no necessity for amending the bill in this particular.

The only remaining question now to be decided, arises on the objection made for the want of proper parties ; as to which the general principle is, that before a final decree can be pronounced, all parties in interest are to be brought before the court, so that their rights may be settled, complete justice may

oe done, and the orders of the court may be safely executed by those who are compelled to obey them.   Mitf. Pl. 133 ; *Marshall* v. *Beverly*, 5 Wheaton, 313 ; Edwards on Parties, 10 ; *Hoxie* v. *Carr*, 1 Sumner, 174.

It is true that a creditor whose remedy at law has been exhausted, may, in certain cases, file a bill for his own benefit only, and without making other creditors standing in the same situation parties.   But when he seeks to carry into effect an assignment in trust for the benefit of creditors, and to obtain his proportion of the trust fund, he is bound to make all the creditors parties.   Or some of the creditors may sue in behalf of themselves, and the other creditors, who may come in, and obtain satisfaction of their demands equally with the plaintiffs in the suit.   And if they decline to do so, they will be excluded from the benefit of the decree, and will nevertheless be bound by the acts done under its authority.   Mitf. Pl. 135 ; *Edmeston* v. *Lyde*, 1 Paige, 637 ; *Wakeman* v. *Grover*, 4 Paige, 33 ; Edwards on Parties, 40 ; *Hamilton* v. *Houghton*, 2 Bligh's Parl. Cas. 169.

This form of proceeding, while it prevents delay, and the multiplicity of suits, which are never to be encouraged, furnishes the court at once with the means of administering equal justice to all parties interested.

Whether the claims of the other creditors have or have not been adjusted, does not appear ; but if they have not been, those creditors should be made parties, or the bill should be so amended as to admit them to come in and to substantiate their claims, so that all parties interested may be bound by the final decree.

After the amendment, the case will be referred to a master, to ascertain the amount of the liabilities of the banks, and the proportions to which the creditors are respectively entitled, should the amount of the liabilities fall short of the amount of the whole claims.

*Referred to a master.*

The plaintiffs having amended their bill by changing it into a creditors' bill, so as to enable all the *cestuis que trust* under the agreement of December 28th, 1833, to come in and prove

Bryant
v.
Russell.

their claims, the case was referred to Mr. Minot, a master in chancery, who made a report at March term 1838.

The master reported, that the two drafts, each for $ 3000, described in the plaintiffs' bill, were contained in the schedule annexed to the agreement of December 28th, 1833.

That the amount due to the plaintiffs and all other persons who appeared before the master, by virtue of any drafts or notes contained in the schedule above mentioned, is (without interest) $ 35,732·17.

That the Bedford Commercial bank and the Merchants' bank, on the 28th of December, 1833, held certain promissory notes signed by Russell & Son, which were unintentionaly omitted on the schedule, and which, together with a draft of Russell & Son on Robinson, Tyson & Co. in favor of B. Mumford, for $ 2500, amount to $ 4882·18. This draft was held by the Merchants' bank on the 28th of December, 1833, and the defendants claimed to have it included in the list of notes and drafts unintentionally omitted. The plaintiffs objected to this draft as not coming within the description of drafts or notes on which Russell & Son, or either of them, were " promisors or acceptors." The defendants claimed a right to introduce further proof of the intention of the parties as to this draft, but the master considered such evidence inadmissible and disallowed the draft.

That one acceptance and sundry promissory notes of Russell & Son, contained in the schedule, and amounting to $2238·45, were not represented or claimed before the master, and had not been paid by the banks.

That all the notes and drafts contained in the schedule, which had been paid by the banks, together with $ 10,000 paid to Robinson, Tyson & Co., amount to $ 54,615·33. This sum includes all the notes and drafts on which the Russells were promisors or drawers, which were discounted by the banks and held by them on the 28th of December, 1833.

That the following (among other) incumbrances existed on the property conveyed to Ricketson and others, at the time of the conveyance, viz. The house on Water street, New Bedford, was mortgaged for $ 3000, by Charles Russell to Abraham Kirby, by a deed executed on the 16th of December,

1833, but not recorded until the 31st. This mortgage was known to Ricketson, at the time of Russell's conveyance to Ricketson and others.

That the real estate in New Bedford was, on the 26th of December, 1833, under attachments, the amount of which incumbrances, with interest to that date, and without costs, was $ 5726·17.

That the Russells undertook to convey to Ricketson and others five eighths of the ship South Carolina, whereas in fact they owned but four eighths. The ship was valued in the schedule of their property at $ 21,000. The difference in value between four eighths and five eighths, at that valuation, is $ 2625, and, making certain deductions from this sum, the loss would be $ 2058·34 ; but the actual sales of four eighths produced $ 7384·08, and the value of one eighth was $1846·02, and making the same deductions the loss would be $ 1279·36. That the Russells also undertook to convey twenty-nine thirty-second parts of the ship Martha, whereas in fact they owned but twenty-five thirty-second parts ; the difference according to the valuation in the schedule, being $ 3125, or according to an actual sale, $ 2645·10.

That Charles Russell assigned to Ricketson and others a mortgage of R. Weeden, which was valued in the schedule at $ 2700, whereas it was of the value of $ 1247·16 only.

That Charles Russell, on the 26th of December, 1833, conveyed to Ricketson and others, in the way of mortgage, " all his right, title and interest" in and to all the real and personal estate belonging to and constituting the establishment called the Washington Iron Works, to secure the payment of $ 20,000. By reason of the lien claimed by the copartners, proprietors and joint owners with C. Russell, of these Iron Works, for the payment of the debts of the company, (which was insolvent,) it was alleged by the defendants that the mortgage was wholly inoperative.

That the aggregate amount of these losses and incumbrances is $ 35,351·40 ; and if the loss on the sales of the South Carolina and the Martha is to be estimated on the valuation of those vessels in the schedule, the sum of $ 1258·88, is to be added to that amount.

In ascertaining the amount of incumbrances, the master computed interest up to the 26th of December, 1833. In the cases of incumbrances founded on attachments he had no means of ascertaining the costs which had accrued to that date, but the amount was inconsiderable.

Exceptions were taken to the master's report, and the parties stated for argument the following questions, arising on the report and on the pleadings and evidence.

1. Whether the draft for $ 2500, drawn by Russell & Son on Robinson, Tyson & Co. in favor of B. Mumford, and dated November 28th, 1833, was within that clause of the agreement of December 28th, 1833, which provides for notes and drafts unintentionally omitted in the schedule.

2. Whether the mortgage to Kirby was an incumbrance, within the proviso annexed to the promissory notes of Ricketson and others and incorporated into the agreement of the 28th of December, 1833.

3. Whether interest and costs on the debts secured by attachment, accruing after December 28th, 1833, should be added to those debts, in computing the incumbrances.

4. Whether partial and total failures of title are to be deemed incumbrances ; and if so, whether they are to be computed according to the nominal value in the schedule, or the actual consideration paid, or the proceeds of the sales, where sales took place.

5. Whether, if the deficiencies of title &c. are not to be accounted or allowed as incumbrances, within the proviso, the defendants are or are not entitled to relief on the ground of misrepresentation at the time of entering into the contract ; or on the ground of failure of consideration.

6. Whether the lien of the partners of Charles Russell in the Washington Iron Works, for payment of debts, constituted an incumbran : on the real and personal estate conveyed, within the meaning of the proviso.

7. Whether the debts named in the schedule and not claimed or proved before the master, are to be deducted from or set off against the incumbrances or notes &c. unintentionally omitted.

8. Whether the defendants are bound to pay all the notes

Bryant<br>v.<br>Russell.

and drafts mentioned in the schedule, excepting such an amount of them as equals the incumbrances and the notes and drafts unintentionally omitted, or whether their liability to pay is limited to their receipts from the sales of the property.

9. Whether the plaintiffs are entitled to interest, and if so, from what times.

10. Whether the amount of incumbrances and notes and drafts unintentionally omitted, is to be apportioned on all the notes and drafts in the schedule, so that they shall bear the loss *pro ratâ* and be paid *pro ratâ*, or whether the defendants were to pay the notes and drafts in full in the order in which they became due, leaving the whole loss to fall on those last or latest due.

11. Are the plaintiffs entitled to costs.

These questions were argued at March term, 1838.

*April* 1st,<br>1838.

*C. P. Curtis* and *B. R. Curtis*, for the plaintiffs, contended, on the 4th question, that the measure of damages by reason of the failure of title, was the consideration paid, with interest. *Marston* v. *Hobbs*, 2 Mass. R. 433 ; *Bickford* v. *Page*, ibid. 455 ; *Caswell* v. *Wendell*, 4 Mass. R. 108 ; *Armstrong* v. *Percy*, 5 Wendell, 535.

On the 5th and 6th questions they said that C. Russell conveyed only "his right, title and interest" in the Washington Iron Works; that the grantees knew the property was subject to the debts of the company and that they were taking Russell's interest in the surplus only, after that lien should be satisfied ; and this lien was not an incumbrance ; *Blanchard* v. *Brooks*, 12 Pick. 47 ; *Brown* v. *Jackson*, 3 Wheat, 452 ; *Hurd* v. *Cushing*, 7 Pick. 169 ; and that being aware of the lien, it was incumbent on them to inquire into the extent of it ; *Mayo* v. *Purcell*, 3 Munf. 243 ; that in point of fact, Russell had no legal estate in the property, he having previously joined with the other proprietors in a deed (which was exhibited to the Court) conveying the same to Thomas and Ellis in fee, in trust to sell the whole property and out of the proceeds to pay the debts of the company, and account for the surplus, if any ; but this was not material, since, if those debts absorbed the whole of the property, Russell's mortgage passed nothing, and if there was a surplus, it passed his interest in such surplus ,

and the defendants must be deemed to have had notice of such conveyance of the legal estate, as the deeds to Thomas and Ellis, and to Ricketson and others, were prepared by the same attorney ; that the defendants were not entitled to relief on the ground of misrepresentation, for it was admitted there was no fraud on the part of Russell ; and that there being no fraud, they were not entitled to relief on the ground of the consideration failing, for where a party buys all the right, title, and interest of the vendor, knowing that there are incumbrances involving a contingency, he buys his chance, and, should the incumbrances prove greater than he expected, he has no claim therefor against the vendor. *Maynard* v. *Moseley*, 3 Swanst. 653 ; 1 Fonbl. Eq. 362, note ; *Farnam* v. *Brooks*, 9 Pick. 232 ; *Perkins* v. *Bumford*, 3 N. Hamp. R. 522.

On the 8th question, they said the obligation of Ricketson and others to pay their notes in full, (except as modified by the proviso,) could not be varied by a parol agreement, nor by the promisors and the banks without the consent of the Russells, and of the creditors, who were *cestuis que trust*. *Ward* v. *Lewis*, 4 Pick. 521 ; *New England Bank* v. *Lewis*, 8 Pick. 118 ; *Pingree* v. *Comstock*, 18 Pick. 46.

On the 10th, they contended that the creditors whose debts became due first were entitled to no preference, but that all were to be paid ratably. *The case of the creditors of Cox*, 3 P. Wms. 341, 344, note 2 ; *Plunket* v. *Penson*, 2 *Atk.* 294 ; *Riggs* v. *Murray*, 2 Johns. Ch. R. 577 ; *Gilpin* v. *Southampton*, 18 Ves. 469 ; *Martin* v. *Martin*, 1 Ves. sen. 211 ; *Morrice* v. *Bank of England*, Cas. temp. Talb. 220, 221 ; 1 Story on Equity, 524 ; *Brown* v. *Allen*, 1 Vern. 31 ; *Brathwaite* v. *Brathwaite*, ibid. 334.

On the 11th, respecting costs, they cited *Clark* v. *Reed*, 11 Pick. 446 ; *Blain* v. *Agar*, 1 Simon, 37 ; *Court* v. *Jeffery*, 1 Sim. & Stuart, 105.

*C. G. Loring*, *F. C. Loring* and *Dehon*, for the defendants. On the 3d question, they contended that interest and costs accruing after December 28th, 1833, on the debts secured by attachment, ought to be added to those debts, in computing the amount of incumbrances paid by Ricketson and others. *Leffingwell* v. *Elliott*, 10 Pick. 204, and 8 Pick. 455 ,

*Wetmore* v. *Green*, 11 Pick. 462; *Wyman* v. *Brigden*, 4 Mass. R. 150 ; *Barrett* v. *Porter*, 14 Mass. R. 143.

On the 4th, they insisted that the failures of title were to be considered as incumbrances ; and that in the case of mortgages, the amount of the incumbrance was the sum paid by Ricketson and others to extinguish it, and in the case of the vessels, it was the difference between what was received on the sale of Russell & Son's interest in them and what would have been received, if their title had not failed in part.

On the 6th, they insisted that the lien of C. Russell's partners, upon the Washington Iron Works, for the payment of the debts of the company, was an incumbrance, within the strict use of that term at common law.   Until the lien should be enforced, he had a legal estate in all the property, real and personal.   By using the words " all his right, title, and interest," he intended to pass the property, and not merely a residuary interest. *Blanchard* v. *Brooks*, 12 Pick. 66.   But if it was not a technical incumbrance, it was an incumbrance within the meaning of that term as used by these parties.   By *incumbrances*, they meant all losses by paramount titles.   It is said, however, that this was not an incumbrance " thereafter appearing " ; that the lien of the other parties must have been known.   This assumes that notice of a contingent lien is notice of an absolute lien to the whole extent of the property.   As between the grantees and the creditors of the company, the grantees would be precluded from alleging want of notice ; but as between the grantees and the grantor, the former had no notice, for the grantor held out to them that there was no incumbrance ; and the plaintiffs stand in no better situation than the grantor.   But if the grantees are not entitled to relief on the ground of an incumbrance, they are entitled to it on the ground of misrepresentation, or of failure of consideration ; and it is immaterial that there was no fraudulent design.   1 Story on Eq. § 193, 195, 196, 197.

As to the 7th, they said that the banks were to pay a specific sum to each creditor named in the schedule, and that the portions due to those who neglected to come in and prove their claims, were not to be paid to the others, but must go over to the surplus fund.

On the 10th, they said the banks were, by the express terms

of their contract, bound to pay the debts on the schedule, in the order in which they became due and payable; and that at least they would be protected in the payments made before they had notice of the deficiency of the property. 1 Story on Equity, § 89, 90, 94, 95, 109.

SHAW C. J. The parties have stated several questions as arising from the master's report, and the exceptions thereto, and the Court have confined themselves to a consideration of these questions.

1. Upon the first question the Court are of opinion, that the draft for $2500 stated in the question, was within that clause in the agreement of the 28th of December, 1833, which provides, that notes and drafts upon which Russell & Son, or one of them, were promisors or acceptors, and which were unintentionally omitted in the schedule, should be paid, as if contained in it.

It appears, that this was a draft, payable at a future day, drawn by them on Robinson, Tyson & Co. in favor of B. Mumford, and by him indorsed, and held by one of the banks, but not accepted. It appears by other parts of the case, that the drawees, Robinson, Tyson & Co., were large creditors of the drawers, and that the drawers had no funds in their hands to meet this bill. It appears further, that several drafts of the same character were included in the schedule. The argument in support of the rejection of this draft is, that the words " promisors or acceptors," used in the agreement, in the clause cited, were used technically, and must be considered as literally including acceptors of a draft, or promisors on a note. But the great question is, what was the intent of the parties. The word " promisor " may, if so intended, include all persons, bound by an express or implied promise. The drawer of a bill promises and undertakes that the drawee will accept it, and thereby complete the security which it is manifestly intended that the payee shall have. But without much relying on this reasoning, the Court are of opinion, from the general terms and leading object of the instrument, as well as from its other provisions, that this clause was intended to include securities held by the banks, though unintentionally omitted, in which the assignors stood as principal debtors; and that " ac ·

ceptors " and " promisors " were put as leading and prominent instances. But upon a draft, on time, between the date and the acceptance, the drawer stands as the principal debtor, especially when, as in this case, the drawee has no funds, and is under no obligation to accept, and from the altered credit and condition of the drawers, is not likely to accept. This is strengthened by the fact, that many other securities of the same kind were embraced in the schedule, and it leads to the conclusion, that this would have been embraced if it had not been unintentionally overlooked. The main object of this clause was by a general description to include those securities, which would have been included in the enumeration, as within the principle of the agreement, but through haste and want of time for thorough search might be omitted in that enumeration. This is *ejusdem generis* with those enumerated.

2. Upon the second question the Court are of opinion, that Kirby's mortgage was an incumbrance within the meaning of the condition annexed to the notes of Ricketson and others, and they have a right to deduct the amount paid to discharge that incumbrance. The condition is, that if it shall hereafter appear, that any incumbrance is existing upon any portion of the real estate, &c. It is conceded, that no mention was made of this incumbrance in the schedule in which this estate was included and valued, and Kirby at that time had not recorded the deed of Russell & Son to him. It is found, however, that Ricketson, one of the makers of these notes, did know of this mortgage of Russell & Son to Kirby, but there is no evidence that it was known to any others. It appears manifest, that this estate was taken by the assignees at a valuation, in which this incumbrance was not taken into account, and that the true purpose of the condition was to provide for incumbrances then existing, but not manifestly and openly appearing, so that they might reasonably be understood not to be then known, recollected, and taken into consideration ; and to oblige these promisors to pay such an incumbrance out of their own funds, when they might be affected by some legal principle with constructive notice, would not be consistent with equity, or with the spirit and intent of the contract.

3. On the third question, the Court are of opinion, that in

computing the amount of incumbrances which the assignees had to pay and discharge, arising from attachments, they had a right to include the interest and costs accruing upon such debts, and the attachments which were made to secure them. The costs and accruing interest, as well as the principal debt, were secured by the attachment as incidental; and to that extent the attachment constituted a deduction from the amount of the available fund.

4. On the fourth question, the Court are of opinion, that the failures of title are to be deemed incumbrances; and that they are to be computed according to the nominal amount at which they are valued in the schedule. If on an article, rated in the schedule at $8000, there is found a failure of title to the amount of one eighth, there must be a deduction of $1000, being one eighth of the rated value in the schedule.

5. The fifth question is disposed of by the opinion above expressed on the fourth.

6. As it now appears, from the papers produced at the hearing, it seems that the real question between the parties is not intelligibly expressed in the question propounded for consideration. Perhaps some amendment may be necessary to place the case properly before the Court.

It appears by the report, that the property embraced in the schedule and assignment to Ricketson and others, was not the property and interest itself of C. Russell in the Washington Iron Works, at Wareham, but that at the time of the assignment, Russell made his promissory note to the assignees for $20,000, and as collateral security, gave them a mortgage of all his right, title and interest in the Washington Iron Works, including real and personal estate. It now appears, that prior to this time, Russell had joined with the other proprietors of the iron works, in a conveyance in fee to Thomas and Ellis, of all their title and interest to the real and personal estate known as the Washington Iron Works, in trust to sell and dispose of the whole estate, out of the proceeds to pay the debts of the company, and account to the proprietors for the surplus, if any. The estate assigned was insufficient to pay the debts, and nothing remained by way of surplus for the proprietors.

The Court are of opinion, that Ricketson and others are en-

Bryant<br>v.<br>Russell.

titled to have a deduction of the whole $20,000 put down in the schedule as the Washington Iron Works, but in fact consisting of the note of Russell for that sum secured by this mortgage on the Washington Iron Works. It can hardly be presumed from the circumstances, that this note was deemed any further valuable, than as it was made so by the collatera' security, and that the failure of title of the collateral security was a failure of title, and an incumbrance on the property assigned within the meaning of the contract. Had the title and interest exceeded $20,000, the assignees had no interest in the surplus ; as far as it fell short this fund failed. This, however, would not have entitled them to a deduction, unless it arose from failure of title. But it appears to the Court, that the title wholly failed. Russell had no legal interest in the Washington Iron Works, on which this mortgage could operate ; it had been conveyed in fee to Thomas and Ellis, in trust, to sell the whole estate. The resulting trust for the proprietors, if of any value, was a claim for a balance in money, and not a legal or even an equitable interest in the estate itself, and no such balance, in fact, existed or could be realized. There was, therefore, an entire failure of title, so far as any thing existed on which the mortgage could operate ; and the resulting claim, such as it was, was a *chose in action*.

7. On the next question the Court are of opinion, that the debts named in the schedule as the debts of Russell & Son, to be provided for, but not claimed nor proved before the master, are not to be taken into consideration in the distribution, nor the dividends which would be due in respect of them if proved, retained by the assignees, but the whole amount is to be distributed amongst those who have proved their debts, provided the assets do not exceed the amount of the debts proved.

8. On the eighth, the Court are of opinion, that the assignees are bound to pay the full amount of their notes, after making the stipulated deductions and indorsements for incumbrances, and that their liability to pay is not limited to their receipts from the sales of the property received by them under the assignment.

9. On the ninth, the Court are of opinion, that the creditors are entitled to interest on their respective debts, to be com-

45 *

puted from the times when their respective notes became due and began to draw interest.

10. This question is attended with more difficulty. It seems highly probable, that the actual result of this assignment, differed very widely from the anticipation, and the well grounded expectations of the parties. It seems to have been expected with great confidence, that the assets would be more than sufficient to pay all the debts provided for, and even leave a considerable surplus. In that event, it would have been wholly immaterial in what order the debts of the creditors should be paid, as all would eventually be paid in full. But by the increase of the debts, and the great deficiency of the assets, they will probably fall quite short of paying all the creditors, and it therefore becomes necessary to determine the rule of apportionment.

It appears to the Court, from the documents and the circumstances of the case, that the original and primary intention of the contract and trust, between Charles Russell & Son and Ricketson and others, and that between the same parties and the banks, was to pay all the debts mentioned in the schedule annexed to the agreement of the 28th of December, 1833, and provided for by that instrument, and that it was not intended to give any one a preference to another, of ultimate payment ; in other words, to pay part in full, and leave part wholly unpaid ; but upon a general principle of equity, where two or more are entitled, as of right, to payment in full, out of a common fund, and the fund from any cause proves insufficient, they must receive and abate in proportion, because, in such case, equality is equity. But although, in the outset, no preference or prior right to ultimate payment was intended, yet we think it is manifest, that it was contemplated that the debts mentioned in the schedule should be paid from time to time, as they fell due at the banks.

If the banks, in the execution of this purpose, before they had any notice of any incumbrances or other charges upon the funds, and before they had notice of any increased claim from notes or drafts unintentionally omitted, in good faith paid to third persons some of those scheduled debts ; inasmuch as they paid in pursuance of what was understood to be the original

design of the contract ; and inasmuch as they could not obtain a reimbursement or contribution from those third persons, they are to be considered in the situation of innocent trustees, who have an equitable right to be protected, and ought not to be deemed as having paid them in their own wrong, and held liable to pay the same amount again.

But these considerations do not apply to any notes or drafts held by the banks themselves, first, because payment to themselves cannot come within the principle, it being a mere transfer on their books, without any change of rights or of property ; and, second, because they can reimburse themselves, it being only a retransfer on their own books.

If any of those debts were paid by the banks in the order in which they were due, before notice that the fund would not be sufficient to pay the whole, those payments are to be deducted , and the balance paid *pro ratâ* to the parties entitled, including in this class all the notes and drafts contained in said schedule, held by the banks in their own right.

11. The question of costs is reserved.

After the foregoing opinion was pronounced, the case was again referred to the master, to inquire whether the banks, or either of them, paid any and what notes or drafts enumerated in the schedule, before they had notice, either express or implied, of any and what incumbrances on the property conveyed to Ricketson and others, or of the unintentional omission out of the schedule, of any and what notes or drafts held by either of the banks on the 28th of December, 1833 ; and to ascertain and report particularly the nature of any such notice, and the time when it was received or implied, and at what time, if any, the banks had notice there would be an ultimate deficiency in the assets for payment of debts mentioned in the schedule ; and to inquire whether any and which of the notes or drafts misdescribed in the schedule, but proved before the master, were presented to the banks, or either of them, for payment, and refused payment, and the times when the same respectively, if any, were so presented and refused.

The master reported, that the existence of six specified notes and drafts, held by two of the banks on December 28th, 1833, and unintentionally omitted on the schedule, was known

to the same banks when those notes and drafts severally became due, viz. January 1st, 2d, 22d, 31st, February 27th and March 15th, 1834. No evidence was offered tending to prove or disprove that at an earlier date than the maturity of the paper, the banks knew of the existence of such paper and that it was unintentionally omitted in the schedule, except the fact that such paper was held by the banks on the 28th of December, 1833, and until it became due.

The master further reported, that J. S. Tillinghast, a witness examined before him on behalf of the plaintiffs, testified that he was a director of the Marine bank in December 1833 ; that he was present at the first meeting of the directors, to consider the proposal to take an assignment of the property of the Russells and advance money upon it to pay their debts ; that Mr. Warren was invited to attend the meeting and his advice was taken ; that Mr. Warren observed, that " the valuation of the Washington Iron Works on the Russells' schedule was much out of the way ; he had doubts if the shares were of any value, and said that heavy assessments had been laid on the stock to pay off the debts of the company "; that at the time of the arrangement with the Russells, the mortgage of Kirby was known to exist ; that the witness knew of it from C. Russell himself, and heard it spoken of at a meeting of the directors ; that he did not know that any other director knew of it at the time he first knew of it ; that the valuation of the whole property assigned was reduced from the estimate of the Russells, and when the board of directors concluded to make the advance, it was thought the valuation was low enough to make it safe for the bank ; and that he heard the cashier say to Rodman, that he had received notice of incumbrances and that the bank must pay no more notes, but the witness did not recollect the date of this notice.

J. B. Congdon, cashier of the Merchants' bank, testified that he had no recollection of any notice given to him, until the written request (of April 6th, 1834) was put into his hands, that the bank would make an indorsement on the note of Ricketson and others, on account of incumbrances.

The questions growing out of the above report were argued at much length by *C. P. Curtis* and *B. R. Curtis,* for the plaintiffs, and *C. G. Loring,* for the defendants.

After this argument the cause was referred to the master, to report a schedule of all the notes and drafts paid by the banks respectively, in the order in which they became payable, and distinguishing those paid to third persons from those paid to the banks themselves ; also to report who were the parties to the notes and drafts paid by the banks to themselves, and what was the value of their liability as drawers, indorsers, acceptors or otherwise, and whether or no such parties were solvent when their notes and drafts became payable ; and whether or no they were notified or called upon for payment in the usual manner.

The master reported a list of fourteen notes and drafts ; and stated that the parties to the same were not notified or called upon for payment in the usual manner, and that the banks, in consequence, lost the security of their names.

SHAW C. J.   It is impossible to keep out of sight the many and almost inextricable difficulties of the present case, arising from the numerous conveyances and agreements, the various changes made in them from time to time, and the various events which have occurred under them.   The most we can expect to do under the perplexities with which the case is now surrounded, is to come to some final decision, which will do as much justice to all the parties, as the case will now admit of.

It is necessary to keep the consideration constantly in view, that the cause has materially changed its aspect since it was first presented ; and this will account for much of the apparent irregularity which has pervaded the case.   Many questions have arisen from facts occurring or discovered since the cause was first brought to a hearing, and have come before the Court upon the reports of the master, and for this reason do not arise out of the formal pleadings in the cause.

It has already been decided, that by the true construction of the arrangement between Charles Russell & Son, with Ricketson and others, and by them with the four banks, who are defendants in this case, the effect of it was to make the banks trustees for the creditors of Russell & Son, whose debts were enumerated or described in the schedule annexed to the agreement.   These arrangements were made on the 26th, 27th and 28th of December, 1833.   Without stating the complicated

VOL. XXIII.

proceedings of the parties, or the various steps which have been taken during a protracted litigation, I shall now state the opinion of the Court upon the several questions which have been argued by counsel and submitted for our decision.

The great question now is, how far are the defendants, the banks, to be protected for payments of creditors made in full, before they had notice that the fund in their hands would not be sufficient to pay in full, all the debts intended to be paid, and provided for, by the assignment. In judging of the nature and degree of this notice, it would be doing injustice to the defendants, to overlook the consideration heretofore taken by the Court and fully explained, that this was not the common case of a fund placed by a failing debtor in the hands of trustees, to pay the debts of the assignor, and if insufficient for that purpose, then to pay the creditors equally and ratably ; for although as a matter of form, in such cases, it is usual to provide that if there be any surplus, it shall be repaid to the assignors, yet in most cases, it proves to be a mere matter of form and is so understood, and therefore the real trust and duty of the assignees is, to pay the proceeds proportionably to the creditors. If in such a case, the assignees should proceed to pay any one in full, it would be manifestly a payment in their own wrong, which neither law nor equity would justify or excuse. But the present was obviously a case of debtors who regarded themselves, and were regarded by those who dealt with them, as solvent, able to pay their debts and having a considerable surplus, but who were unable, from their property, to raise ready money to pay their bank debts and other demands as they should become due. They therefore made an assignment to Ricketson and others, of a large amount of property, estimated to be much more than sufficient to pay their debts. Ricketson and others gave their notes to Charles Russell & Son for an amount deemed to be sufficient to pay all the debts to be provided for ; but to these notes was annexed a condition, that if it should thereafter appear, that any incumbrances existed upon any portion of the real or personal property conveyed, such incumbrances should be deducted from, and indorsed on said notes. These notes, subject to such condition, having been indorsed to the banks, by Russell &

Son, pursuant to the general plan devised to carry this purpose into effect, the banks, by an agreement with Russell & Son, undertook to pay their debts, from time to time as they should become due.  These debts generally were enumerated in a schedule annexed ; but there was a further provision,. that it should also extend to notes, if any, held by the banks and unintentionally omitted.  This agreement has been held to be a trust for the payment of creditors, and as such we now consider it.  But by its terms, it was not a fund held in trust to pay creditors ratably ; but in terms to pay the several debts, as they should fall due, and manifestly in the full assurance, that the fund would be sufficient to pay the whole.

Upon the nature of this trust, it has already been decided, that the leading object was to satisfy and discharge the debts of Russell & Son ; but a secondary and important object, both with them and with the creditors, amongst whom were the same banks, was to pay the notes from time to time as they should become due, inasmuch as it was not the intent of any of the parties, that these debtors should stop payment, or become bankrupt.  But as the ultimate application of the fund to the payment of all the debts, was apparently the leading and primary object, it was held by the Court, that when it became apparent that both could not be accomplished, and that payment of the debts in full as they became due, must leave some of the creditors without any thing, it was the duty of the banks to stop and hold the funds, to be paid and distributed ratably amongst all those equitably entitled to participate in the trust fund.  Such would be the case, when it became apparent, that by the diminution of the fund, by the appearances of incumbrances, and by the increase of the debts entitled to be paid under the terms of the agreement, the fund would not hold out to pay them all.

Now it is alleged by the banks, that they had no such knowledge, and no such notice as should have put them on their guard, till the receipt of the letter of Ricketson and others of the 6th of April, 1834, giving them notice of a large amount of incumbrances and failures of title, in respect to the property assigned, and requiring a corresponding indorsement upon and deduction from the notes of Ricketson and others, and that

Bryant
*v.*
Russell.

from and after that time they have not paid any of the scheduled notes in full. We have already decided, that failures of title were to be deemed incumbrances, and deducted from the notes of Ricketson and others, according to the true construction of the condition of the notes, because they diminished the trust fund *pro tanto*.

Now in deciding what should be regarded as knowledge or sufficient notice on the part of the banks, thus standing as trustees, that the fund would prove insufficient to pay all the creditors, and thus call upon them to abandon the line of conduct prescribed by the instrument and agreement under which they were proceeding and require them to wait for a course to be prescribed for them by a court of chancery or otherwise, a mere technical and constructive notice raised by rules of law, cannot be deemed sufficient. It must be shown to have been apparent to them, that the fund would fall short of paying all those intended to be secured by it, and that a *pro ratâ* distribution must be made.

Considering the evidence in this point of view, the Court are of opinion that there is no sufficient proof that the banks had notice that the funds would be insufficient to pay all the debts intended to be provided for, until the 6th of April, 1834. It follows, for the reasons already given, that all payments previously made by them, of notes as they successively became due, and held by third persons, must be deemed to have been paid in good faith, and to that extent the banks were entitled to be protected.

The banks took the notes of Ricketson and others, with the condition appearing on the face of them, and therefore took them subject to the same condition. Any deduction, therefore, which Ricketson and others, the promisors, would have a right, by the terms of the condition, to make as against Russell & Son, they would have an equal right to make against the banks. Some deductions were claimed to be thus indorsed, which are objected to by the plaintiffs. This applies to Kirby's mortgage, which was a mortgage upon a portion of the assigned property, executed but not recorded before the assignment. This, it is said, was known to Ricketson, one of the assignees, but not communicated to the others or to the

Bryant
v.
Russell.

banks. The exception was, of such incumbrances as might thereafter appear. This was included in a very large amount of property conveyed all at one time and manifestly in great haste; and it is not to be presumed that the precise condition of each item of property, was then examined by the assignees; and though this might be considered sufficient to obviate the strict rule, avoiding mortgages and conveyances not registered, as against a subsequent incumbrancer or purchaser without notice, yet we think it was not such notice to the assignees, as to preclude them from showing it, as an after appearing incumbrance.

Weeden's mortgage was the case of failure of title; it was supposed to be an available mortgage for money; but it turned out to be a mortgage conditioned to indemnify against debts, which Russell & Son were liable for but had not paid. It does not appear to the Court, that the assignees had notice of the nature of the security, when taken, and it was so put down on the schedule as to lead them to believe that it was an available security. As it turned out not to be so, it was a deduction *pro tanto* from the fund.

But it was contended that the defendants were bound to know the existence and amount of notes unintentionally omitted; that these notes, constituting as they did, an increased charge upon the fund, and being within the control of the banks themselves, might have been immediately discovered, and therefore the banks ought to have known earlier, that the fund would prove insufficient.

The case supposes, that the existence of these notes was not known, at the time the schedule was made and the instrument completed, because if then known they would have been inserted. It also shows, that by the understanding of the parties, the banks were not to be affected with constructive notice, merely by having the notes in possession, because they were described as being in their possession, and yet as unintentionally omitted. But it is said they should have made immediate search, and this would have led to an earlier discovery and put them on their guard. If it had not then been expected that the fund would be sufficient to pay all the debts, if a dividend and apportionment of the funds to the creditors

46

Bryant
v.
Russell.

had been in contemplation, there would have been much weight in this consideration. But as it was, there was no particular motive to search for, and ascertain these notes, until they successively became payable ; and it is found by the master, that in point of fact, they did not know of their existence, until they became due. We think there was no actual knowledge of them, and no such constructive notice as to affect their rights

In regard to the suggestion, that the banks ought not to be credited with the amount of the misrecited notes, which they have declined paying on account of the misrecital, the argument is this, that if upon that ground, as upon any other, the trustees had withheld the funds, until those facts were after wards disclosed which deterred them from further payments, so much more would have been saved for distribution amongst the creditors. This is true. But on the ground, on which the defendants were then proceeding, of paying all as they became due, if they had not specifically reserved such funds for the payment of the misrecited notes, they would still have paid in full those which came next in succession, and the actual fund remaining would have been the same. The ground on which the defendants are allowed to hold good the payments actually made, is, that they acted in good faith, under an honest belief that all were to be ultimately paid, and therefore, in that respect, that they are not chargeable with such breach of trust as to render them personally responsible. This ground stands unaffected by the fact, that they did not set apart a specific portion of the fund, for the misrecited notes, which they decline paying.

But the objection which is most earnestly pressed on the consideration of the Court, arises from the entire failure of the title of the assignees, to the Washington Iron Works. Amongst the property of Russell & Son, they held an interest as copartners, in a large establishment at Wareham, for carrying on iron works. Though not then a corp ration, it was a large concern, in which there were several partners, and it was conducted and carried on by others. This property was not taken by the assignees, at any valuation ; but they took the note of Russell & Son, for $ 20,000, with a mortgage upon these iron works, as collateral security. There is evidence tending to

show, that the interest of Russell & Son was valued, when they entered on this negotiation, at a much larger sum than that for which it was taken as security. We have heretofore investigated the circumstances of this case, and determined that as the note of Russell & Son was of no value without the collateral security, and as the title to the iron works had wholly failed, this was an incumbrance upon the assigned property, within the condition of the notes, and therefore was to be indorsed and deducted. The question now is, whether the banks had actual or constructive notice of this failure, before April 6th, 1834, so that they must have known, that to this extent the fund had failed. This assignment was made at the beginning of the year 1834. The iron works were then in operation, and continued so, not only till the ensuing 6th of April, but to a considerably later period. It is not in the usual course of things, that a mortgagee would look after the title of property, which he has taken merely as collateral security, as he would after property so assigned and transferred by an absolute conveyance, as to come under his immediate control and management. The works were going on in the hands of the managing partners and agents, as they had done ; they were situated in another county, and the trust deeds which had been given of them, and which subsequently absorbed the property, were registered in another county. There is no evidence tending to show any actual notice to the banks, of the failing condition of this property, from the time the mortgage was taken, until the 6th of April, nor indeed until a considerable time after. But the plaintiffs rely mainly on the consideration, that at the time of the assignment, the banks were cautioned by Mr. Warren, that this property might not be worth so much as it was taken for, and that Mr. Warren knew or had the means of knowing that the trust deed had been given, which afterwards absorbed the company's property. This was not stated by Mr. Warren as a fact ; no notice was given at that time of any facts. All that was said, was said by way of caution, before the conveyance, and in fact the property was taken as security for a much less sum than it had been valued at by Russell & Son

Further, all that it is supposed that Mr. Warren knew, **was**

that a trust deed had been given, as the means of paying the debts of the company. But such trust deed did not create or increase the debts of the company, nor diminish the value of its property. All the interest which the partners and owners could have in it, was the surplus after the debts were paid ; and to such surplus they were as well entitled after the trust deed was executed, as before. The value of the property was precisely the same. A communication of that fact, therefore, could have furnished the assignees with no additional means of estimating the true value of the property. It would have led to a belief that the company were considerably in debt ; but that would be to be presumed from the nature and extent of the operations they were then carrying on. The fact of being indebted would serve to put the assignees upon their guard in estimating the value, at which the property might be safely taken as security, and to that extent, for aught appears, it had its effect. Supposing then that they acted with reasonable caution in taking this security originally, and they had no motive to act otherwise, there is nothing to show that they had any more information on the subject, until the ensuing April and afterwards.

The Court are therefore of opinion, upon this part of the case, that the defendants had no such knowledge of the failure of the trust fund, and the insufficiency of that fund to pay all the debts intended to be secured by it, as to lead them to believe that the debts could not all be paid, and therefore, paying in good faith, and in the honest belief that they were discharging the trust reposed in them with fidelity, they ought to be protected against the payment of debts in full to third persons, because they have no means of reimbursement, and because otherwise they would be personally liable, which ought not to be when they have acted in good faith.

But another and very important question arises, upon another part of the case. In deciding that the banks, acting in good faith, and having paid notes due to third persons, under a mistaken belief that they were doing so rightfully, should be protected, the Court further decided, that so far as they had applied the funds under their administration as trustees, to the payment of notes held by themselves, they should not be protected, because being both debtor and creditor, as the debts

were paid by a mere transfer on their books, they could reimburse themselves, by a re-transfer on their books ; or what is the same thing, in making a dividend, may now treat these notes as if no such application of the funds had been made. But it was subsequently argued, and we were very much impressed by the force of this argument, that the banks, in thus applying the trust fund to the payment of notes, on which they had other security, in the names of drawers and indorsers, were losers to the same extent as they were in paying the notes due to third persons, and therefore had an equal claim in equity, to be protected in these payments.

It is suggested in answer to this argument, that by the very arrangement, by which the banks undertook to provide for the payment of all these notes and drafts, by the promisors and acceptors, they necessarily discharged the drawers and indorsers, standing in the character of sureties ; that if these notes were to be paid in full by the promisors as they became due, the drawers and indorsers would be *de facto* exonerated ; or if the operation of the arrangement was to postpone the claim of the holders upon the promisors, the drawers and indorsers would be thereby in like manner discharged. And upon the best consideration which we have been able to give to this instrument, we are of opinion that its legal effect was to bar any action by these banks upon those drawers and indorsers. If the covenant was an absolute one, on the part of the banks, to pay these notes, such covenant being made with the promisors, it would be deemed a good defence at law to any action, which the banks as holders might bring against the promisors. And it is very clear, that if the holders, by their own act, barred themselves of an action against the promisors, they thereby discharged the drawers and indorsers. The deed between Russell & Son on the one side, and these banks on the other, contained an express stipulation on the part of the banks, to pay these notes as they became due whilst the funds held out, and this point assumes the fact, that they had funds at the time the notes fell due, and therefore at law, the covenant would have been a good defence to an action against Russell & Son. But if the covenant did not amount to an absolute agreement to pay the debts, but did amount to a definite agree-

ment to postpone the payment, until the funds should be fully realized, and the funds were of such a nature that they could not be realized till after the notes fell due, the legal result would be the same.  For, when the holders of a note or draft enter into any agreement with the promisors to postpone the time of payment beyond the day fixed, it has the same effect to discharge the drawers and indorsers.  We think, therefore, that the banks lost nothing by failing to make demands and give notices to indorsers and drawers, and had such demands been made and notices given, it would have given the banks no legal claim upon the drawers and indorsers.

But we think there is another answer to this claim of the banks, which is equally decisive, and it is this.  The banks were acting in the double capacity of trustees and *cestuis que trust*.  They were themselves creditors, being large holders of notes and acceptances, intended to be provided for, under this assignment.  It may be, and the case goes on the assumption that they did act in good faith and under a mistake of their rights and duties, as trustees, and *cestuis que trust*.  So far as they acted purely as trustees, in the disposal of the trust fund, and by mistake misappropriated the fund, that fund and those interested in it, may equitably be held to suffer the consequences, or at least cannot equitably call upon the trustees personally to make good the loss out of their own funds.  But so far as they stood and acted in the capacity of *cestuis que trust*, creditors beneficially interested, they must themselves bear the consequences of their own mistakes, so far at least as to stand upon an equality with other creditors, having the same equitable claims.  In no case can a trustee so deal with the funds, as to stand upon a better footing in regard to his own rights, than that of others standing upon the same general grounds of equity.  Suppose the banks did make an honest mistake and in consequence of it failed to notify promisors and indorsers, and thereby sustained a loss, it was a mistake made by them in their character of holders of notes and drafts, and not a mistake made in their character of trustees.  In respect therefore to such loss, they are not within the rule, that trustees acting as trustees, in good faith, and making an honest mistake in the execution of the trust, shall be so far protected, that in ac-

counting for such trust fund, they shall not be held to answer for such loss personally. On both grounds, therefore, the Court are of opinion, that the dividend should be now made so as to allow the banks to retain such proportion of the sums, heretofore appropriated, to the payment of their own notes and drafts, before they had notice that the trust fund would be insufficient to pay the whole, as they would now receive upon a final dividend, had no such payments been made ; and that they account for the overplus, as part of the trust fund, so as to put the unpaid creditors, in this respect, upon an equal footing with themselves.

In regard to costs, the Court are of opinion, that the costs of the plaintiffs ought to be allowed and paid from the fund, and that the costs of the defendants ought not to be allowed.